IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

ROBERT V. WOODARD,                  §
                                    §
            Petitioner,             §
                                    §
v.                                  §        Civil Action No. 4:13-CV-905-O
                                    §
WILLIAM STEPHENS, Director,         §
Texas Department of Criminal Justice, §
Correctional Institutions Division, §
                                    §
            Respondent.             §

## OPINION AND ORDER

Before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner, Robert V. Woodard, a state prisoner confined in the Correctional Institutions Division

of the Texas Department of Criminal Justice (TDCJ), against William Stephens, Director of TDCJ,

Respondent.   The prior referral to the Magistrate Judge is withdrawn.   After considering the

pleadings and relief sought by Petitioner, the Court has concluded that the petition should be denied.

## I.  BACKGROUND

Petitioner was charged in Tarrant County, Texas, in a multi-count indictment with sexually

assaulting A.O., a child younger than 14 years of age, in January 2003 and March and April 2004.[1]

Adm. R., SH7-Writ WR-79,347-02, 178-79, ECF No. 23-2.  The indictment also included a repeat-

offender notice.  *Id.*  Petitioner's four-day jury trial commenced on June 2, 2008.

At trial, A.O. testified that when she was 11 or 12 years of age and had no place to stay, she

moved in with Petitioner, a friend of A.O.'s mother who was a crack addict and prostitute, and his

wife and stepson.  When A.O. was 13, Petitioner began to engage in sexual activity with her,

_____

[1]Throughout this opinion, "A.O." is substituted for the victim's name.

including sexual intercourse.  He made A.O. perform sexual acts for school supplies, new clothes and other things she needed.  During that time, A.O. contracted a sexually-transmitted disease (STD).  A.O. eventually told her best friend, Julie, and Julie's mother about the abuse.  Julie's mother asked A.O. to go back to the house and "do it one more time" to make sure there would be evidence.  That night, Petitioner initiated sexual relations with A.O., and the next day A.O., accompanied by Julie and her mother, reported the abuse.  A.O. told the sexual assault nurse examiner (SANE) that the night before Petitioner made her shower and then sexually assaulted her and that it was an "ongoing pattern."  A.O. was 14 at the time and six weeks pregnant.  A.O. terminated the pregnancy, and DNA testing performed on the six-week-old fetus and samples from A.O. and Petitioner, although inconclusive, indicated that of the markers examined, Petitioner could not be excluded as a contributor of the fetal material.  Y-STR testing also indicated that the paternal parent of the fetus came from Petitioner's "paternal line" and that 99.7 percent of the African-American male population in the testing facility's database were excluded as donors of the fetal material.  A.O. denied that someone other Petitioner sexually abused her.  Adm. R., DA12-RR, vol. 3, 22-24, 26, 35,123-30, 149-50, 162, 175, 177, 181-82, ECF No. 20-2.

Petitioner's written statement to police was also admitted into evidence, wherein he stated (all spelling, punctuation and grammatical errors are in the original):

> On Sunday April 4, 2004 I was in Bryan Texas with my church.  We went to Bryan to visit another church and did not return to Fort Worth until 7-8pm.  A.O. had spent the weekend with a friend, a school age girl that had recently moved here from New York.  I didn't want A.O. at the house by herself because her mother had told me recently that A.O. had been sneaking out of the window at night.

> When I got home, I picked up A.O. from her friend's home and she told me that she wanted to go to New York.  I told her she wasn't going to move to New York and told her that she was going to go live with her mother or with her aunt

(Maria).  A.O. started arguing with me and I pretty much said some bad things. Things you shouldn't really say to a kid, but I was really angry.

We went home that Sunday night and she went to her bedroom and went to bed.  I went to my room and went to bed.  The next day she went to school like normal.  She came to my room, knocked on the door and said that she was going to school.

Monday I went to Dallas for work and to check on a house that me and my wife were getting .  Veronica [Petitioner's wife] went with me to Dallas.  I picked her up and we were gone until about 6:30pm, when I made it home.

That night I walked into my living room, and could smell sex.  I know the smell of sex and I asked A.O. what was going on and who had been there, but she denied it.  That's when I told her that she was just like her mother.  She told me that I was just like everyone else and that she hated me.

There were a lot of things said.  I told her that she didn't have a choice and that she definitely had to go.  She continued to deny having sex in the living room. I looked all through the house to make sure there wasn't anyone there.  I checked her room, but her bed was still all made up.

After things calmed down, I watered my plants outside and was just still really mad.  I was very tired and later went to sleep.

I went to bed wearing a pair of boxers that open up in the front.  I usually sleep on my back with a light sheet on top of me.  At about 2am or around there, I woke up and A.O. was on top of me naked.  I woke up because feel the weight of her and her movement.  My penis was out of my boxers and I could feel the warmth of her vagina on my penis.  I could feel the moisture and the warmth of her vagina on my penis and she was rubbing up and down slowly.  The hair on her head was wet so she may have been in the shower.  My penis was flaccid, because I am unable to get an erection.  A.O. was looking down at me and she said that she wanted me to "come".  She wasn't smiling or anything, she just said "come" once or twice.  I tried to push her off of me, but she resisted.  I really had to push hard to get her off of me.

I push her off me to the floor naked, and that's when I started calling her those words.  I called her a whore, and told her she was trash.  I again told her that she was no different from her mom.  I told her that she had to go.

After A.O. left my room, I noticed that my leg was wet.  I don't think the wet spot was from me, I think it was A.O.

> At first I thought it was a dream.  I thought maybe it was my wife, but it turned out to be A.O.
>
> I didn't sleep the rest of the night.  The next morning, A.O. knocked on the door and didn't wait for me to say come in.  She walked into my room and I was lying on the bed, I had my clothes on this time.  A.O. walked over and kissed me on the forehead and said she was going to school.

Adm. R., DA13-RR, vol. 6, State's Ex. 3, ECF No. 21-1.

Finally, the state elicited testimony from a law enforcement officer that Petitioner jumped bail in August 2007 and several months later was apprehended in Temple, Texas, where he was living and working under the assumed name of Jeffrey Johnson.  Adm. R., DA12-RR, vol. 3, 197-98, ECF No. 20-2.

Petitioner, who was 50 years old at the time of trial, testified on his own behalf.  He testified that he was a deacon in his church and, in 2003, took responsibility for A.O. as a favor to her parents, with whom he was acquainted.  He and his family tried to assimilate A.O. into the family, but A.O. was a problem child.  A.O. did not obey them and was several grades behind in school.  A.O. did not like to clean or bathe and had "bad body odor."  Petitioner tried to find other places for A.O. to stay, but it never worked out.  He denied sexually abusing A.O. and testified that his statement to police was true.  He also testified that he had never had an STD, that he was incapable of having an erection, and that he suffered from high blood pressure and diabetes.  Petitioner indicated that he has three brothers and many nephews, all of whom had visited and/or stayed at his home at one time or another and had access to A.O.  According to Petitioner, he jumped bail because he had a fight with his wife, missed his court date, was "in a bad situation," and was scared.  His explanation for A.O.'s actions was that she was angry with him and wanted to set him up and was coached by Julie's mother.  *Id.* at 208, 211-12, 219-20, 222-29.

Based on the evidence, a jury found Petitioner guilty of three counts of aggravated sexual assault of a child under 14 years of age and two counts of sexual assault of a child under 17 years of age. SH7-Writ WR-79,347-02, 180-90, ECF No. 23-2.  Petitioner pleaded true to the repeat-offender notice, and the jury assessed his punishment at 50 years' confinement for each count of aggravated sexual assault and 30 years' confinement for each count of sexual assault of child.  *Id.* The trial court ordered that the 50-year sentence for count two run consecutively to the 50-year sentence for count one and the 30-year sentences in counts four and five.  *Id.*  The Seventh District Court of Appeals of Texas affirmed the trial court's judgments, and the Texas Court of Criminal Appeals refused Petitioner's petition for discretionary review.  Mem. Op, ECF No. 18-1; Cover Sheet, ECF No. 17-1.  Petitioner also filed a state habeas application challenging his conviction, which was denied by the Texas Court of Criminal Appeals without written order on the findings of the trial court.  Appl. for Writ of Habeas Corpus, cover, ECF No. 17-6.  This petition for federal habeas relief followed.

## II.  ISSUES

In one ground, Petitioner claims his trial counsel, Fred Cummings, was ineffective because counsel–

(1)     failed to object to leading questions by the prosecutor;
(2)     failed to preserve error for appeal;
(3)     failed to challenge the indictment for double jeopardy;
(4)     failed to object to improper closing arguments;
(5)     failed to subject the state's case "to meaningful adversial [sic] testing by asserting opinion of guilt of" Petitioner; and
(6)     failed to inform Petitioner of the state's plea-bargain offers.

Pet. 6, ECF No. 1. In the supplemental memorandum attached to the petition, Petitioner also claims counsel was ineffective by failing to investigate, interview, and present witnesses for

5

"defense/mitigation purposes." *Id.* Pet'r's Supp. Mem., 2, ECF No. 1.

## III. RULE 5 STATEMENT

Respondent believes that the petition is neither barred by the statute of limitations nor successive and that the claims have been exhausted in state court. Resp't's Ans. 12, ECF No. 16.

## IV. DISCUSSION

### A. Legal Standard for Granting Habeas-Corpus Relief

A § 2254 habeas petition is governed by the heightened standard of review provided for in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. Under the Act, a writ of habeas corpus should be granted only if a state court arrives at a decision that is contrary to or an unreasonable application of clearly established federal law as established by the Supreme Court or that is based on an unreasonable determination of the facts in light of the record before the state court. 28 U.S.C. § 2254(d)(1)–(2); *Harrington v. Richter,* 562 U.S. 86, 100 (2011). This standard is difficult to meet and "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, the statute requires that federal courts give great deference to a state court's factual findings. *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct. A petitioner has the burden of rebutting the presumption of correctness by clear-and-convincing evidence. 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *Williams v. Taylor*, 529 U.S. 362, 399 (2000).

Finally, when the Texas Court of Criminal Appeals denies relief in a state habeas-corpus application without written order, as in this case, it is an adjudication on the merits, which is also

6

entitled to the presumption of correctness. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997). Under these circumstances, a federal court may assume the state court applied correct standards of federal law to the facts, unless there is evidence that an incorrect standard was applied. *Townsend v. Sain,* 372 U.S. 293, 314 (1963)[2]; *Catalan v. Cockrell,* 315 F.3d 491, 493 n.3 (5th Cir. 2002); *Valdez v. Cockrell,* 274 F.3d 941, 948 n.11 (5th Cir. 2001); *Goodwin v. Johnson,* 132 F.3d 162, 183 (5th Cir. 1997).

### B.  Ineffective Assistance of Counsel

A criminal defendant has a constitutional right to the effective assistance of counsel at trial. U.S. Const. amend. VI, XIV; *Strickland v. Washington*, 466 U.S. 668, 688 (1984). To establish ineffective assistance of counsel a petitioner must show (1) that counsel's performance fell below an objective standard of reasonableness, and (2) that but for counsel's deficient performance the result of the proceeding would have been different. *Strickland*, 466 U.S. at 688. Both prongs of the *Strickland* test must be met to demonstrate ineffective assistance. *Id.* at 687, 697. In applying this standard, a court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance or sound trial strategy. *Id*. at 668, 688-89. Judicial scrutiny of counsel's performance must be highly deferential and every effort must be made to eliminate the distorting effects of hindsight. *Id.* at 689. The Supreme Court recently emphasized in *Harrington v. Richter* the manner in which a federal court is to consider an ineffective assistance of counsel claim raised in a habeas petition subject to AEDPA's strictures:

> The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's

---

[2]The standards of *Townsend v. Sain* have been incorporated into 28 U.S.C. § 2254(d). *Harris v. Oliver*, 645 F.2d 327, 330 n.2 (5th Cir. 1981).

performance fell below *Strickland's* standard.  Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

562 U.S. at 101 (quoting *Williams v. Taylor,* 529 U.S. 362, 410 (2000) (emphasis in original)).

Accordingly, it is necessary only to determine whether the state courts' adjudication of petitioner's ineffective assistance claims was contrary to or an objectively unreasonable application of *Strickland.  Bell v. Cone,* 535 U.S. 685, 698-99 (2002); *Kittelson v. Dretke,* 426 F.3d 306, 315-17 (5th Cir. 2005); *Schaetzle v. Cockrell,* 343 F.3d 440, 443 (5th Cir. 2003).

In the state habeas proceedings, counsel, who has been licensed since 1986 and board certified in criminal law since 1996, responded to Petitioner's claims by affidavit as follows:

**1.   Applicant alleges Counsel failed to object to leading questions by the prosecutor[3]**

I did not fail to object to leading questions by the prosecutor.  Mr. Woodard

---

[3]In his state habeas application, Petitioner complained of the following five leading questions:

**Q.  Okay.  And you were a year behind in school?**
A.  Yes.
**Q.  Do you remember going to the hospital in 2004?**
A.  Yes.
**Q.  Okay.  So on April 6, 2004, you were 14 years old?**
A.  Uh-huh.
**Q.  Okay.  And that was when you were in sixth or seventh grade?**
A.  I was in the seventh grade.
**Q.  Okay.  What about penetration of your vagina with his finger?  Would that happen?**
A.  Yes.

Adm. R., SH7-Writ WR-79,347-02, 23, ECF No. 23-1.

identified five questions in his Application as leading questions that were asked without objection. Black's Law Dictionary defines a leading question as "one which instructs witness how to answer or puts into his mouth words to be echoed back." None of the prosecutor's questions listed by the Applicant violated Rule 611(c), in my opinion, and I did not object for that reason.

Testimony pertaining to the complainant's age had been provided earlier in the trial by the SANE nurse and the complainant herself. The relevant testimony from the SANE nurse is excerpted from the Reporter's Record below:

> Prosecutor:  Okay.  How old was Angela on April 6th, 2004?
> SANE Nurse:  She was 14.
> Prosecutor:  Did she tell you – did she tell you anything else about how these activities would occur when you talked to her?
> SANE Nurse:  You know, she had told me that her – and if I get this a little bit confused, I'm sorry – that her dad was I guess going to jail or going to prison and that this was who she was to stay with.  We had talked a little bit about – you know, she's 14 – school, friends, that kind of thing.  She had informed me that to get school supplies, to get new shoes for school, that she would have to do oral sex on this gentleman.
> Prosecutor:  What do you remember most about this case?
> SANE Nurse:  I remember telling a 14-year-old that she was pregnant.
> Prosecutor:  Did she seem to you sad?  I mean, like what did she seem to you?
> SANE Nurse:  She was quiet.  I mean, I just – I can remember asking her – having her tell me it wasn't a – you know, the giddy, excited 14-year-old telling a story.  It was just – she seemed, you know, kind of sad and just quiet.

At the beginning of her testimony, prior to the questions misidentified by Applicant as leading, the complainant testified she was 18 years of age and that her birthday was July 18th.  The jurors knew the date of her testimony was June 3, 2008 and with that information could determine the complainant's age on the dates alleged in the indictment.

## 2.  Applicant alleges Counsel failed to preserve error for appeal

Applicant's complaint derives from the following direct examination of the complainant by the prosecutor:

Q.  And you said at that point, when you first moved in, you were

9

going into the fourth grade?
A. Yes.
Q. How old would you have been then?
A. I couldn't say.
Q. I'll tell you what.
    . . .
Q. A.O., we got involved in this case in 2004.  Do you remember that?
A. Yes.
Q. Okay.  Do you remember going to the hospital in 2004?
A. Yes.
Q. Okay.  So on April 6th of 2004, you were 14 years old?
A. Uh-huh.
Q. Okay.  And that was when you were in the sixth grade or the seventh grade?
A. I was in the seventh grade.
Q. Seventh grade.  So if you moved in when you were in the fourth grade, you would have been 11 maybe?
MR. CUMMINGS: Objection to leading, Judge.
THE COURT: Sustained.
Q. How old do you think you would have been when you first moved in?
A. About – about 12 or 11 years old.

I knew that Rule 611(c) of the Texas Rules of Evidence allows for some leading questions if they are "necessary to develop the testimony of a witness." When her witness failed to answer the question about her age in the fourth grade, I knew that some leading questions were legally permissible.  I made my objection to "Leading" when I believed the prosecutor had exceeded the leeway allowed in Rule 611(c) and the court sustained that objection.  I did not pursue an adverse ruling because (1) my immediate goal was to stop the prosecutor from asking leading questions of the witness and (2) I knew there was no appellate consequence to an adverse ruling of that particular objection.  I knew no prejudice to the Applicant could be shown because testimony about the complainant's age had already been presented to the jury through the SANE nurse and the complainant herself without resorting to leading questions.

### 3.  Applicant alleges Counsel failed to challenge the indictment for double jeopardy purposes

I did not challenge Count One and Count Two of Indictment 1061062R for double jeopardy purposes because they allege two different offenses.

10

Indictment 1061062R contained seven (7) counts when we went to trial. Each of those counts alleged a separate offense.  Prior to trial I filed a Motion to Sever the counts of the indictment which was heard and denied by the Trial Court. I also filed a Motion To Require Election by the State which was heard and denied prior to trial but reconsidered at the close of evidence.  As a result, the State agreed to waive Paragraph Two and Count One, Count Four, and Count Five as well as Count Six and Count Seven.  The remaining five counts were submitted to the jury in the Court's Charge.  Count One alleged penetration of the female sexual organ of a child younger than 14 years of age by insertion of his penis on or about the 1st day of January 2003; Count Two alleged penetration of the female sexual organ of a child younger than 14 years of age by insertion of his finger; Count Three alleged penetration of the mouth of a child younger than 14 years of age with the sexual organ of the defendant on or about the 1st day of January 2003; Count Four alleged penetration of the female sexual organ of a child under 17 years of age by insertion of his penis on or about the 15th day of March 2004; and Count Five alleged penetration of the female sexual organ of a child younger than 17 years of age by insertion of his penis on or about the 5th day April 2004.

Applicant argues that the allegations in Counts One and Two constitute a single offense and I should have complained of double jeopardy.  He is incorrect.

### 4.  Applicant alleges Counsel failed to object to prosecutor's improper closing arguments[4]

---

[4]Petitioner complains of the following argument during the guilt/innocence phase:

Now, little did she know that a few years after she moved in, when she was 13 years old, the Defendant would make her have sex with him.  That's Count One of your indictment.  It's aggravated sexual assault of a child because she told you she was 13 at the time.

Now, we don't' have an exact date on here, and we're not required to.  Or we do have an exact date, but we don't know exact dates from A.O. because it's hard to remember, but what we do know, she told you, unequivocally, didn't waiver, that she was 13 years old when it first happened.

Count Two, also 13 when the Defendant inserted his finger.  Another aggravated sexual assault of a child count.

Count Three, also 13 years of old when the Defendant made her have oral sex with him. Another aggravated sexual assault of a child.

. . .

[T]here's one more thing I want to cover in this charge.  It's toward the end.  It says, "You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to their testimony."  Let's think about that because – and I want to talk about that with regard to just two witnesses right now, A.O. and the Defendant, because the Defendant took the stand yesterday and told you an utterly ridiculous story. . . .  He says, "Well, I woke up, and she was on top of me."  So, essentially, she assaulted me.  That is ridiculous, ladies and gentleman. . . .

. . .

Now, compare his utterly ridiculous story, which would almost be laughable if this case weren't so incredibly sad, to what you heard from A.O. when she took the stand, because A.O. told

11

you about how excited she was to move in, to finally have a family.  And A.O. didn't come off as someone that was angry, just sad by what had happened.  <u>She didn't come off as someone with an ax to grind</u>.  It's four years later, ladies and gentlemen.  She hasn't seen him since then.  <u>There's no vendetta.  There's no setup.  She's not out to frame the Defendant.  She simply took the stand and told you what happened to her</u>.

. . .

I absolutely agree with the defense attorney that it comes down to whether or not you believe Robert Woodard, <u>but I'm going to submit to you you shouldn't, you can't.  You owe it to A.O.</u> to field out what his story truly is.  You heard it yesterday.  You heard what I'm going to argue yesterday when I talked to him, <u>because his story is that ludicrous</u>.

You know that <u>in order for the defense's version to be true, A.O., at 14 years old, . . . would have had to understand Y-STR testing</u>.

. . .

So, for four years now, A.O. has been in the foster care system because she really kind of wanted to move to Dallas with them.  <u>Really?  Really?  A.O. put herself through an abortion just to frame him?  On what planet does that make sense</u>?

. . .

<u>[M]ost of the time, these cases are done without DNA.  Most of the time.  Most of the time</u>.  I am grateful I have something to bring you, but I could have brought you just A.O., and <u>I'm telling you right on A.O's – on A.O.'s demeanor alone, you should have convicted him</u>.  Did you see her face when I made her identify the Defendant?  Did you see that?  Did you see that the entire time Fred was crossing her she couldn't even look over there?  <u>She is scared to death of this man.  She never wanted to see this man again.  This is not a vendetta.  She is not a manipulative child</u>.  She is a little girl who over and over again was sexually assaulted by that man.

. . .

She is the perfect victim.  She is.  Because – Robert Woodard knew it because <u>he's the perfect predator</u>. . . .

This little girl right here came in here and <u>told you about the worst thing that has ever happened to her</u>. . . .  She had to go and get an abortion at 14 years old. . . .  She didn't do it to set him up.  <u>She did it because she was all the sudden in the worst possible situation.  She's 14 years old, and she's pregnant with her rapist's child</u>.

. . .

If you are truly innocent, you come in here and you defend it.  You do not run away and start a new life.  And, you certainly don't come in here and continue lying about how you just might have forgotten that you had a court date.  <u>Really?  That's just one more time that you can look at him and be like, do you really expect us to believe your version?  Really</u>?

. . .

And <u>please tell A.O. and all of the other little girls out there that this kind of thing happens</u> . . . .  You don't have to let it keep happening. . . .  If you come in here and tell us what happens, we will believe you, because <u>she deserves to be believed</u>.

Pet'r's Mem. in Support 25-28 (emphasis added by Petitioner).

She complains of the following argument during the punishment phase:

We make promises to each other as a society.  We promise things we won't do to each other, things we will do for each other.  And <u>we certainly all as a community make promises that we will protect our children.  That's your job now.  To not only give justice to A.O. but to protect the other children of the world</u>.

. . .

12

I did not object to the prosecutor's jury arguments at either phase of the trial because I believed them to be proper and within the areas of (1) summation of the evidence, (2) reasonable deductions from the evidence, (3) answers to argument of opposing counsel, or pleas for law enforcement.

**5.     Applicant alleges Counsel failed to subject the prosecution's case to meaningful adversarial testing by asserting his personal opinion of petitioner's guilt**

I did not assert a personal opinion of the Applicant's guilt to the jury or anyone else.  I did not have such an opinion.  Applicant has taken a statement, out of context, from each argument to support this allegation.

In the guilt/innocence phase of the trial, my opening comments were as follows:

Ladies and gentlemen of the jury.  We talked a little bit about

---

He deserves life because <u>A.O. is the exact opposite of every little girl in his family</u>.  Every girl in his family had a support system, had people that would believe them, weren't on the street begging for someone to take care of them.  <u>That's why he picked A.O. and not his niece</u>.  He picked A.O. because she was a broken, unbelievable, in his mind, child, and he could do what he wanted with her.  She was trash, and it was his decision what she got to do and how he got to treat her. . . . He knew that she had nowhere to go, and he abused it over and over and over again.  And <u>that is the promise he broke to all of us in Tarrant County</u>, and that is the promise that is unacceptable.  <u>You cannot break that promise in our county</u>.
. . .
Because that's what this man does.  He runs away.  Look at his old prior.  He had a fake name then.  Oh, I committed a robbery.  My name is Robbie Snow.  Now I'm Robbie Woodard.  <u>I get caught molesting children, now I'm Joe Johnson</u>. . . .
It is hard to do what you have to do, but it is a lot harder to be A.O. and so you have to put your personal discomfort aside, and <u>you have to do what's right for our children</u>.
. . .
<u>You're still hiding it from your wife.  You are hiding who you are.  The monster you are behind the door, you are hiding from your family</u>. . . .  All our family love us.  That's one of the promises they make to each other.  <u>But you are putting them up here to say you're a good person when you know darn good and well what you do behind closed doors.  That's not fair to them</u>.
Ladies and gentlemen, <u>this case will haunt you.  It haunts us all</u>. . . .  If you ever wanted to wake up in the middle of the night and wonder where that man is, <u>you've got to give him life so that you can sleep at night knowing that A.O. doesn't have to worry about running into him at the grocery store, so that other little girls, under whatever new name he assumes then, don't know what he's like behind that door</u>.
. . .
<u>Sexual abuse is something that will affect her for the rest of her life</u>.  Why should he have anything less.

*Id.* at 29-31.

my job as a criminal defense lawyer during voir dire, and <u>it's a fairly overwhelming one in a case like this</u>.

You got a chance to meet Woodard yesterday, and you saw that he is a fairly simple man. He is a – works as a janitor, deacon in his church. Has a fairly simple life. And I think you could tell from the way he responded to my questions and Ms. D'Avignon's questions that he's not a communicator. So he had to rely on the Court to appoint him a lawyer, and that happens to be me, and now I am charged with speaking for him. And I am going to try to do that this afternoon in this very few moments that I have.

Applicant alleges that the above underlined statement is an assertion of my personal opinion of his guilt. Placed in context of the entire opening of my argument, the court can see that I was referring to my responsibility to defend and speak for my client. During the rest of my argument I summarized the evidence from the client's testimony and perspective and pointed out the weaknesses in the State's case, arguing reasonable doubt.

In the punishment phase argument, Applicant calls the Court's attention to the following underlined statement as an assertion of my personal opinion of his guilt. I have included portions of my argument before and after his excerpt to show the true context of my statement:

She testified to that. But as far as the scientific evidence, the scientific evidence could just as easily point to Robert's brother. Just as easily. At both DNA labs. That's not like a fingerprint, folks. It's not that exact. We're talking about their family. Robert doesn't want to point the finger at any of his brothers, and A.O. has told you it was Robert, and you have decided that was enough. But A.O. didn't have to know the science to make this accusation. All A.O. had to be was a 14-year-old desperate to find a place to stay other than the streets. Trying to get the semen, didn't get the semen, didn't even know she was pregnant. Didn't even know. <u>He has always professed his innocence. I don't know that it was smart to do so</u>. You 12 have decided he's guilty. The wisdom of the courthouse is you don't insult a jury and you don't tell them you were wrong, but he's not – he's consistent and always has been, he's not guilty.

My argument was a reference to Applicant's testimony of his innocence during the punishment phase and an attempt to minimize any negative reaction to that testimony in their punishment verdict. The state argued very passionately for a life sentence. The jurors, who did not know the Trial Court would stack their sentences,

14

assessed 50 years as the longest of his sentences instead.

**6.   Applicant alleges Counsel failed to investigate, interview, and present witnesses for defense/mitigation purposes.**

I thoroughly reviewed the State's file and investigated the State's evidence. The Tarrant County Criminal District Attorney's Office has an open open file policy. I was permitted to photocopy the entire State's file other than material withheld as work product. As I became aware of additional information in the possession of the police, I continued to acquire that information through our defense investigator and through the District Attorney's office. I obtained copies of police reports, medical records, CPS records, and DNA test reports from two different laboratories through discovery. We acquired the client's medical records, interviewed potential witnesses, obtained a professional review of the state's DNA testing, and had additional independent DNA analysis performed on the client's behalf.

I requested a court-appointed private investigator to assist me in my investigation of this case. The court appointed David Marlow who met with the Applicant, located and interviewed witnesses, and attempted to obtain additional evidence for our defense of the client. Mr. Marlow obtained the client's medical records from his personal physician. Both Mr. Marlow and I attempted to obtain information from the client about potential fact and character witnesses to assist us with his defense. Applicant was uncooperative with our efforts. He moved without notifying me or his bondsman. He changed his telephone numbers without notifying me or his bondsman. He missed or cancelled appointments with me. He would not return Mr. Marlow's telephone calls when Mr. Marlow left detailed voicemail messages about needing the client's assistance in identifying potential defense witnesses. Mr. Marlow prepared several reports contemporaneous with his investigation that document his efforts that are attached to this affidavit.

Applicant's medical records do, in fact, indicate the Applicant complained of erectile dysfunction to his physician but they also reveal that the condition was being treated with Viagra. I decided not to call Applicant's personal physician for that reason. Applicant's medical condition was presented to the jury through his statement to the Police Detective as well as through his testimony without discussing his Viagra prescription.

Applicant complains that I did not produce records that he had never had a sexually transmitted disease. I discussed the impossibility of proving a negative with him prior to trial. I knew Applicant would testify and he informed the jury on direct examination that he had never had an STD.

I maintained a "Chronology & Summary" of my representation of Applicant

contemporaneous with my representation of him.[5] I have included relevant portions of that chronology in order to respond to Applicant's accusation that I failed to investigate his case. . . .

> I represented Applicant to the best of my ability under the circumstance of his case. The Applicant was not in custody during most of my representation of him yet he would not come to my office to discuss his case when I asked him to do so and he would not return the telephone calls of my investigator when he was informed the investigator was trying to locate witnesses on his behalf. Applicant was uncooperative in his own defense until he was placed in custody just prior to his trial. I evaluated the evidence in Applicant's case and advised him accordingly. The State made several plea bargain offers to the Applicant over the course of my representation and I communicated those offers to him. When he made counter-offers to the State, I negotiated on his behalf. Finally when the Applicant decided to exercise his right to a jury trial I defended him to the best of my ability.

Adm. R., SH7-Writ WR-79,347-02, 65-74, ECF No. 23-1 (citations to the record omitted).

The state habeas judge, who also presided at trial, found counsel's affidavit credible and entered findings, too numerous to list, consistent with the affidavit and the documentary record, which were later adopted by the Texas Court of Criminal Appeals. *Id.* at cover; Adm. R., SH7-Writ WR-79,347-02, 166-71, ECF No. 23-2. Relevant here, and based on the totality of counsel's representation, the state court found that counsel did not object to questions Petitioner alleges were leading because they were not leading questions that violated Texas Rule of Evidence 611(c); that counsel did not challenge the indictment on double jeopardy grounds because all counts alleged separate offenses as a matter of state law; that counsel met with Petitioner, located and interviewed witnesses, reviewed the state's file, investigated the state's evidence, and obtained a private investigator to assist in his investigation; that counsel and his investigator attempted to obtain information about potential fact and character witnesses from Petitioner but Petitioner was uncooperative; that counsel's complained-of jury arguments were not personal comments on

---

[5]The more than four-page "Chronology & Summary" is not reproduced in this opinion.

Petitioner's guilt and were reasonable trial strategy; that counsel did not object to the state's complained-of jury arguments because they fell within the permissible areas of argument under state law; that counsel conveyed all plea bargain offers to Petitioner and counter offers to the state; that counsel properly evaluated the evidence and advised Petitioner accordingly; that counsel properly subjected the state's case to meaningful adversarial testing; and, additionally, that Petitioner had failed to show that, but for counsel's acts or omission, there is a reasonable probability that the outcome of his trial would have been different.  Adm. R., SH7-Writ WR-79,347-02, 171-74, ECF No. 23-2.

Absent clear and convincing evidence in rebuttal, the Court defers to the state court's factual findings.  Applying the appropriate deference and having independently reviewed Petitioner's claims in conjunction with the state court records, it appears that the Supreme Court has not specifically addressed one or more of the claims raised by Petitioner or that, where the Supreme Court has done so, the state court's application of *Strickland* was reasonable.  Petitioner's claims are conclusory, with no legal and/or evidentiary basis, refuted by the record, involve state evidentiary rulings or other matters of state law, and/or involve strategic and tactical decisions made by counsel, all of which generally do not entitle a state Petitioner to federal habeas relief.[6]  Furthermore, even if Petitioner

---

[6]*See, e.g., Lopez v. Smith,* — U.S. —, 135 S. Ct. 1, 3 (2014) (providing absent a decision by the Supreme Court addressing "the specific question presented by a case" a federal court cannot reject a state court's assessment of claim); *Burt v. Titlow,* — U.S. —, 134 S. Ct. 10, 17 (2013) (noting the absence of evidence cannot overcome the presumption that counsel's conduct fell within wide range of reasonable professional assistance); *Gonzalez v. United States,* 553 U.S. 242, 249 (2008) (providing tactical decisions generally controlled by counsel include "the arguments to advance"); *Strickland,* 460 U.S. at 691 (providing strategic decisions by counsel are virtually unchallengeable and generally do not provide a basis for post-conviction relief on grounds of ineffective assistance of counsel); *Alvord v. Wainwright,* 469 U.S. 956, 960 n.5 (1984) (providing decision on what witnesses to call is "the exclusive province of the lawyer"); *Johnson v. Cockrell,* 306 F.3d 249, 255 (5th Cir. 2002), *cert. denied,* 538 U.S. 926 (2003) (providing counsel is not required to make  frivolous or futile motions or objections); *Wilkerson v. Cain,* 233 F.3d 886, 892-93 (5th Cir. 2000) (providing decisions regarding presentation of evidence is a question of trial strategy); *Green v. Johnson,* 160 F.3d 1029, 1042 (5th Cir. 1998) ("Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue."); *United States v. Green,*

could demonstrate defective assistance based on one or more of his claims, he has not made a showing of *Strickland* prejudice. *Strickland,* 466 U.S. at 694-96. Assuming the jury believed A.O., it had overwhelming evidence by which to convict Petitioner, and his sentences are within the statutory range for the offenses as a repeat offender. Further, even though counsel failed to preserve for appeal one or more of Petitioner's claims, Petitioner has failed to establish a meritorious claim.

## V. CONCLUSION

For the reasons discussed herein, Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is **DENIED**. Further, pursuant to 28 U.S.C. § 2253(c), for the reasons discussed herein, a certificate of appealability is **DENIED**.

**SO ORDERED** on this 28th day of April, 2015.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

---

882 F.2d 999, 1003 (5th Cir. 1989) (providing "[a] defendant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial"); *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (ineffective assistance claims "based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain").